**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CHAILE STEINBERG, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| MEAD JOHNSON NUTRITION COMPANY, JAMES M. CORNELIUS, STEVEN M. ALTSCHULER, HOWARD B. BERNICK, KIMBERLY A. CASIANO, ANNA C. CATALANO, CELESTE A. CLARK, STEPHEN W. GOLSBY, MICHAEL GROBSTEIN, KASPER JAKOBSEN, PETER G. RATCLIFFE, ELLIOTT SIGAL, ROBERT S. SINGER, MICHAEL SHERMAN, RECKITT BENCKISER GROUP PLC, AND MARIGOLD MERGER SUB, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Case No. _____

JURY TRIAL DEMANDED

CLASS ACTION

<u>**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**</u>

Plaintiff, by her undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

<u>**NATURE OF THE ACTION**</u>

1.     This action stems from a proposed transaction announced on February 10, 2017 (the "Proposed Transaction"), pursuant to which Mead Johnson Nutrition Company ("Mead," "Mead Johnson," or the "Company") will be acquired by Reckitt Benckiser Group plc ("Parent") through its wholly owned subsidiary, Marigold Merger Sub, Inc. ("Merger Sub" and together with Parent, "Reckitt" or "Reckitt Benckiser").

2.      On February 10, 2017, Mead Johnson's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Reckitt.   Pursuant to the terms of the Merger Agreement, shareholders of Mead Johnson will receive $90.00 in cash for each share of Mead Johnson common stock they own.

3.      On March 13, 2017, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.   Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Mead Johnson common stock.

9.      Defendant Mead Johnson is a Delaware corporation and maintains its principal executive office at 2701 Patriot Blvd., Glenview, Illinois 60026. Mead Johnson's common stock is traded on the NYSE under the ticker symbol "MJN."

10.     Defendant James M. Cornelius ("Cornelius") is a director and Chairman of the Board of Mead Johnson.  According to the Company's website, Cornelius is Chair of the Nominating and Corporate Governance Committee.

11.     Defendant Steven M. Altschuler ("Altschuler") is a director of Mead Johnson. According to the Company's website, Altschuler is Chair of the Compensation and Management Development Committee.

12.     Defendant Howard B. Bernick ("Bernick") is a director of Mead Johnson. According to the Company's website, Bernick is a member of the Compensation and Management Development Committee and the Risk Management and Compliance Committee.

13.     Defendant Kimberly A. Casiano ("Casiano") is a director of Mead Johnson. According to the Company's website, Casiano is a member of the Audit Committee and the Nominating and Corporate Governance Committee.

14.     Defendant Anna C. Catalano ("Catalano") is a director of Mead Johnson. According to the Company's website, Catalano is a member of the Nominating and Corporate Governance Committee and the Nutrition Science and Technology Committee.

15.     Defendant Celeste A. Clark ("Clark") is a director of Mead Johnson.  According to the Company's website, Clark is a member of the Audit Committee and the Nutrition Science

and Technology Committee.

16.     Defendant Stephen W. Golsby ("Golsby") is a director of Mead Johnson. According to the Company's website, Golsby is a member of the Compensation and Management Development Committee and the Nutrition Science and Technology Committee.

17.     Defendant Michael Grobstein ("Grobstein") is a director of Mead Johnson. According to the Company's website, Grobstein is Chair of the Risk Management and Compliance Committee.

18.     Defendant Kasper Jakobsen ("Jakobsen") is a director of Mead Johnson and has served as President and Chief Executive Officer ("CEO") since 2013.

19.     Defendant Peter G. Ratcliffe ("Ratcliffe") is a director of Mead Johnson. According to the Company's website, Ratcliffe is Chair of the Audit Committee.

20.     Defendant Elliott Sigal ("Sigal") is a director of Mead Johnson. According to the Company's website, Sigal is Chair of the Nutrition Science and Technology Committee.

21.     Defendant Robert S. Singer ("Singer") is a director of Mead Johnson. According to the Company's website, Singer is a member of the Compensation and Management Development Committee and the Risk Management and Compliance Committee.

22.     Defendant Michael Sherman ("Sherman") is a director of Mead Johnson. According to the Company's website, Sherman is a member of the Audit Committee and the Nominating and Corporate Governance Committee.

23.     The defendants identified in paragraphs 10 through 22 are collectively referred to herein as the "Individual Defendants."

24.     Defendant Parent is a company incorporated in England and Wales and a party to the Merger Agreement.

25.     Defendant Merger Sub is a Delaware corporation, a wholly owned indirect subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action on behalf of herself and the other public stockholders of Mead Johnson (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

27.     This action is properly maintainable as a class action.

28.     The Class is so numerous that joinder of all members is impracticable.  As of March 9, 2017, there were approximately 183,617,672 shares of Mead Johnson common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

29.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

30.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

31.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible

standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

32.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company*

33.     Mead Johnson manufactures, distributes, and sells infant formula, children's nutrition, and other nutritional products.  The Company offers routine infant formula products, in addition to specialty formula products and children's nutrition products.  The Company markets its products to mothers, health care professionals, and retailers in approximately 50 countries in Asia, North America, Latin America, and Europe.

34.     On October 27, 2016, Mead Johnson issued a press release wherein it reported its financial results for the fiscal third quarter of, 2016.

35.     In explaining the results, Jakobsen stated:

Given known headwinds over the next year, we anticipate only modest improvements to both our underlying sales and earnings per share in 2017.  In this context, continued strong performance against our expense reduction targets will support our investment in longer term growth initiatives and protect our 'best in class' level of profitability.  In the longer term, underlying fundamentals for our core category are still supportive of our growth ambitions.  Hence, we remain committed to making the necessary investments in our future.

36.     On January 26, 2017, the Company issued a press release wherein it reported its financial results for the fiscal third quarter ended December 31, 2016.

37.     In the press release, Mead Johnson reported that the Company had experienced

growth in a number of metrics, including EBIT, and that Jakobsen had a positive outlook as to the Company's future:

> In the fourth quarter we continued to make progress with a series of important strategic transitions in key markets. Our imported products again grew strongly in China - and we doubled our sales volume via e-commerce out of Hong Kong over the prior quarter. Though it will take some time for us to complete the transition phase we are currently in, we are encouraged by early signs our plans are working.

38.     With respect to these results and the Company's outlook for the future, Jakobsen also commented:

> [The year] 2017 will see us complete our strategic transition program.  We expect some pressure on both topline and costs in the beginning of the year, and the impact of currency and rising dairy costs will likely weigh on results.  The impact will be partially offset by momentum behind productivity initiatives in both cost of goods and operating expenses.  As previously stated, we expect only very modest growth in both Sales and EPS on a constant dollar basis - with performance strengthening through the second half of the year.

### *Background of the Proposed Transaction*

39.     Beginning in December 2015 and continuing through fall 2016, the Company began engaging in discussions regarding potential strategic alternatives. The Proxy Statement reflects that, despite expressions of interest from multiple parties, the discussions did not lead to any definitive transactions.

40.     Ostensibly because of these shortcomings, the Company consulted with Goldman Sachs & Co. ("Goldman Sachs") throughout 2016 concerning "various potential strategic alternatives."   Notwithstanding Goldman Sachs' reputation in the banking industry, the Company subsequently determined to engage a second financial advisor.   To that end, on September 30, 2016, the Company also engaged Morgan Stanley & Co. LLC ("Morgan Stanley") for further assistance.   The Proxy Statement is silent as to the reason that the Board determined it needed two investment bankers, including whether that decision related to some

aspect of Goldman Sachs' performance or a potential conflict of interest on the part of Goldman Sachs.

41.     A few months later, in December of 2016, the Company began discussions with representatives of Reckitt Benckiser, as well as JAB Holdings B.V. ("JAB"), Reckitt Benckiser's largest stockholder.   Reckitt Benckiser initially expressed an interest in considering an acquisition of the Company, but, essentially, conditioned its interest on the Company completely eschewing any sort of pre-signing market check.  In fact, Reckitt Benckiser essentially went so far as to threaten a prompt withdrawal from any discussions should the Company seek out or consider other potential buyers.

42.     The Company acceded to Reckitt Benckiser's threats, and continued discussions at this point solely with what appeared to be its preferred buyer.  On January 13, 2017, that obedience was rewarded with a Reckitt Benckiser proposal to acquire the Company for $90.00 per share in cash.  The offer, however, was conditioned on a lack of willingness for the would-be acquirer to participate in a broad sales process.

43.     On January 18, 2017, the Board authorized the creation of an ad hoc committee of the Board (the "Ad Hoc Committee") for the purpose of assisting the full Board in its consideration of any potential transaction.

44.     On January 27, 2017, Cornelius called a representative of Reckitt Benckiser in an attempt to elicit an increase in its offer on the basis of the further information received and diligence conducted by Reckitt Benckiser in Chicago.  That invitation promptly was rejected.

45.     During this period, the Company also received incoming interest from an entity identified as "Company A."  When Mead Johnson's representatives raised the prospect of some sort of pre-signing market check, however, Reckitt Benckiser again threatened to withdraw from

the process.  Reckitt Bensicker also was successful in totally shutting down attempts by the Company to include a post-signing go-shop provision in the Merger Agreement.  In short, Reckit Benckiser was successful in shutting out any potential competition for the Company, and also never once raised its offer after making its initial indication of interest.

46.     Eventually, on February 9, 2017, the Board approved the Merger Agreement.

47.     On February 10, 2017, the parties executed the Merger Agreement and announced the Proposed Transaction on the same day.

*The Preclusive Merger Agreement*

48.     The Individual Defendants caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

49.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Sections 6.03(a) of the Merger Agreement states in pertinent part:

>    (a) General Prohibitions. Except as permitted by this Section 6.03, the Company shall not, shall cause its Subsidiaries not to, shall cause each Company Transaction Representative not to, and shall use its reasonable best efforts to cause each Other Company Representative not to, directly or indirectly, (i) solicit, initiate or knowingly facilitate or encourage the submission of any Acquisition Proposal, (ii) enter into or participate in any discussions or negotiations relating to an Acquisition Proposal with, furnish any non-public information relating to the Company or any of its Subsidiaries or afford access to the business, properties, assets, books or records of the Company or any of its Subsidiaries to, or knowingly assist, participate in, facilitate or encourage any effort by, any Third Party that is seeking to make, or has made, an Acquisition Proposal. . . .

50.     Additionally, Sections 6.03(a) of the Merger Agreement provides that the Company shall not "amend or grant any waiver or release under or fail to enforce any standstill or similar agreement with respect to any class of equity securities of the Company or any of its Subsidiaries. . . ."

51.     The Merger Agreement also contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Reckitt Benckiser a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 6.03(b) states in pertinent part:

> (ii) following receipt of a Superior Proposal after the date of this Agreement, the Board of Directors of the Company may (A) make an Adverse Recommendation Change or (B) terminate this Agreement pursuant to and in accordance with Section 10.01(d)(i) and Section 10.03 in order to enter into a definitive, written agreement concerning a Superior Proposal; and
> (iii) other than in connection with a Superior Proposal, the Board of Directors of the Company may make an Adverse Recommendation Change,
> in each case referred to in the foregoing clauses (i), (ii) and (iii), only if the Board of Directors of the Company determines in good faith, after considering advice from a financial advisor of nationally recognized reputation and outside legal counsel to the Company, that the failure to take such action would (or, in the case of clause (i), could) reasonably be expected to be inconsistent with its fiduciary duties under Delaware Law. . . .

52.     Further locking up control of the Company in favor of Reckitt Benckiser, the Merger Agreement provides for a "termination fee" of $480 million, and up to $20 million in expense reimbursement, payable by the Company to Reckitt Benckiser if the Individual Defendants cause the Company to terminate the Merger Agreement.

53.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

***Inadequate Merger Consideration and Interests of the Company's Officers and Directors***

54.     The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

55.     Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

56.     In addition, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

57.     Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

58.     For example, Mead Johnson's senior management team will retain their positions following the close of the Proposed Transaction.

***The Proxy Statement Omits Material Information, Rendering It False and Misleading***

59.     Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.   The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

60.     First, the Proxy Statement omits material information regarding Mead Johnson's financial projections.

61.     For example, with respect to Mead's financial projections, the Proxy Statement fails to disclose: (i) a reconciliation of GAAP EBIT to non-GAAP unlevered free cash flows; (ii) dividends; (iii) stock-based compensation; (iv) net earnings attributable to shareholders; (v) dividends attributable to unvested shares; (vi) undistributed earnings attributable to unvested shares; (vii) all balance sheet items (total debt, non-controlling interest, cash and cash

equivalents) used in Morgan Stanley's Discounted Equity Value Analysis; (viii) fully diluted share counts used in Morgan's Discounted Equity Value Analysis; and (iv) synergies, as well as the costs expected to be incurred to realize such synergies.

62.     Further, the Proxy Statement fails to: (i) specify how stock-based compensation was treated in the calculation of Adjusted EBIT and Adjusted EBITDA; (ii) explain the reason dividends and undistributed earnings are deducted in the calculation of Adjusted EPS, which is material in light of the fact that these items are not expense items; and (iii) specify how Goldman Sachs and Morgan Stanley, respectively, treated stock-based compensation in the calculation of unlevered free cash flow.

63.     The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

64.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the "Unaudited Prospective Financial Information" section of the Proxy Statement.

65.     Second, the Proxy Statement omits material information regarding the financial analyses performed by the Board's financial advisors in support of their respective "fairness opinions."

66.     With respect to Goldman Sachs' Selected Companies Analysis, the Proxy Statement fails to disclose the objective selection criteria Goldman Sachs used to select the companies, as well as the observed company-by-company financial benchmarking metrics examined by Goldman Sachs.  Further, the Proxy Statement fails to disclose how stock-based

compensation was treated in the calculation of EBITDA.

67.     With respect to Goldman Sachs' Illustrative Present Value of Future Share Price Analysis, the Proxy Statement fails to identify the assumptions underlying Goldman Sachs' estimate of Mead's cost of equity, and fails to quantify, and provide the basis for, each assumption.

68.     With respect to Goldman Sachs' Illustrative Discounted Cash Flow Analysis, the Proxy Statement fails to identify the assumptions underlying Goldman Sachs' estimate of Mead's weighted average cost of capital, and fails to quantify and provide the basis for each assumption.  The Proxy Statement also fails to disclose the implied terminal pricing multiples corresponding to the assumed perpetuity growth rates.

69.     With respect to Goldman Sachs' Selected Transactions Analysis, the Proxy Statement fails to disclose the objective selection criteria Goldman Sachs used to select the transactions, as well as the observed transaction-by-transaction enterprise values and financial benchmarking metrics examined by Goldman Sachs.  Further, the Proxy Statement fails to explain the inconsistency between apparently using unadjusted EBITDA to calculate transaction multiples, while applying selected multiples to Mead's adjusted EBITDA.

70.     With respect to Morgan Stanley's Research Price Targets analysis, the Proxy Statement fails to identify the assumptions underlying Morgan Stanley's estimate of Mead's cost of equity, and fails to quantify and provide the basis for each assumption.

71.     With respect to Morgan Stanley's Selected Companies Analysis, the Proxy Statement fails to disclose the objective selection criteria Morgan Stanley used to select the companies, as well as the observed company-by-company financial benchmarking metrics examined by Morgan Stanley.

72.     With respect to Morgan Stanley's Precedent Transactions Analysis, the Proxy Statement fails to disclose the objective selection criteria Morgan Stanley used to select the transactions, as well as the observed transaction-by-transaction enterprise values and financial benchmarking metrics examined by Morgan Stanley.  Further, the Proxy Statement fails to provide the EBITDA multiple and LTM revenue growth observed by Morgan Stanley for Mead.

73.     With respect to Morgan Stanley's Discounted Cash Flow Analysis, the Proxy Statement fails to identify the assumptions underlying Morgan Stanley's estimate of Mead's weighted average cost of equity, and fails to quantify and provide the basis for each assumption. The Proxy Statement also fails to disclose the implied perpetuity growth rates corresponding to the assumed terminal pricing multiples.  Further, the Proxy Statement fails to explain the use of forward pricing multiples to calculate terminal value, given that the projections extend only to 2021, and the Proxy Statement must disclose the 2022 figure, or provide the assumptions used by Morgan Stanley to derive the 2022 EBITDA.

74.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Opinion of Goldman, Sachs & Co." and (ii) "Opinion of Morgan Stanley & Co. LLC."

75.     Third, the Proxy Statement omits material information regarding the background of the Proposed Transaction.  The Company's stockholders are entitled to an accurate description of the process the directors used in coming to their decision to support the Proposed Transaction.

76.     For example, the Proxy Statement fails to disclose the reasons the Company retained a second banker, including whether it was due to any perceived conflicts of interest.

77.     The Proxy Statement also fails to disclose whether the Company entered into any confidentiality agreements with any interested parties other than Reckitt and, if so, the terms of

those confidentiality agreements.

78.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the "Background of the Merger" section of the Proxy Statement.

79.     Fourth, the Solicitation Statement omits material information regarding potential conflicts of interest of the Company's executive officers and Goldman Sachs.

80.     Specifically, the Solicitation Statement indicates that, upon the completion of the Proposed Transaction, the Company's "executive officers at the effective time of the merger will be the executive officers of the surviving corporation," but the Proxy Statement fails to disclose the nature and timing of the discussions between Reckitt and the Company's executive officers regarding this post-merger employment, as well as the terms of the post-merger employment.

81.     Further, the Solicitation Statement indicates that "Goldman Sachs has provided certain financial advisory and/or underwriting services" to the Company and Reckitt and their affiliates "from time to time," but it fails to disclose the nature, timing, and compensation earned by Goldman Sachs for those past services.

82.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Mead Johnson's stockholders.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Mead Johnson

83.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

84.     The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material

facts necessary to make the statements therein not materially false or misleading.  Mead Johnson is liable as the issuer of these statements.

85.     The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

86.     The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

87.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

88.     The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

89.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

90.     Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Reckitt

91.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

92.     The Individual Defendants and Reckitt acted as controlling persons of Mead

Johnson within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Mead Johnson and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

93.     Each of the Individual Defendants and Reckitt was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

94.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Proxy Statement.

95.     Reckitt also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

96.     By virtue of the foregoing, the Individual Defendants and Reckitt violated Section 20(a) of the 1934 Act.

97.     As set forth above, the Individual Defendants and Reckitt had the ability to exercise control over and did control a person or persons who have each violated Section 14(a)

of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their

positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934

Act.   As a direct and proximate result of defendants' conduct, plaintiff and the Class are

threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining defendants and all persons acting in

concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.      In the event defendants consummate the Proposed Transaction, rescinding it and

setting it aside or awarding rescissory damages;

C.      Directing the Individual Defendants to disseminate a Proxy Statement that does

not contain any untrue statements of material fact and that states all material facts required in it

or necessary to make the statements contained therein not misleading;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as

well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for

plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: March 21, 2017

**RIGRODSKY & LONG, P.A.**

By:  */s/ Brian D. Long*

Seth D. Rigrodsky (#3147)
Brian D. Long (#4347)
Gina M. Serra (#5387)
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Tel.: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
Email: bdl@rl-legal.com
Email: gms@rl-legal.com

*Attorneys for Plaintiff*